# PRISCILLA J. WHALEN et al. *vs.* THE BALTIMORE AND OHIO RAILROAD COMPANY.

*Covenant by Railway Company to Maintain Siding on Cove-nantee's Land Not Perpetual—Substantial Compliance.*

A contract providing that a railway company shall maintain a station for passengers at a certain place is substantially complied with by the construction and maintenance of a station there for a number of years. Such a contract does not bind the company to keep a station forever at that place.

A railroad company covenanted with a landowner and his assigns to construct and maintain a turnout and siding at a certain point on the land and there take up and set down passengers and freight. The company maintained the siding for nearly sixty years, when the exigencies of its business required a different location of its tracks to be made and the siding was abandoned. In an action for breach of the covenant, *held*, that in view of the fact that the covenant does not provide for the maintenance in perpetuity of the services in question, and of the fact that they were maintained for many years, and in view of the circumstances which caused their abandonment, there has been no breach of the covenant and the plaintiff is not entitled to recover.

*Decided January 12th, 1910.*

Appeal from the Baltimore City Court (DOBLER, J.).

The cause was argued before BOYD, C. J., BRISCOE. PEARCE, SCHMUCKER, BURKE, THOMAS, PATTISON and URNER, JJ.

*Edward M. Hammond,* for the appellants.

This Court having decided in *Whalen v. B. & O. R. Co.,* 108 Md. 11, that the said covenants inure to the benefit of the plaintiffs, it is difficult to discover just why the plaintiffs

could be ousted and deprived of their valuable rights thereunder without the violator of those rights being liable in damages.

To say that damages cannot be recovered on a contract because it is against public policy premises the fact that at the time the contract was made, it was wrongful or against public policy. This cannot be argued since that decision.

As the contract as originally entered into could not at that time be avoided as against public policy, then in the changes of time when the railroad seeks to avoid its execution that compensation must be paid before our rights can be so annihilated.

The Supreme Court in *B. & O.* v. *Voigt,* 176 U. S. 5, said: "It must not be forgotten that the rights of private contract are no small part of the liberty of the citizen, and that the usual and most important function of Courts of justice is rather to maintain and enforce contracts, than to enable parties thereto to escape from their obligation on the pretext of public policy, unless it clearly appears that they contravene public right or the public welfare." See also *Printing Co.* v. *Sampson,* L. R., 19 Eq. 465.

*Greenhood on Public Policy* lays down as Rule V: "If a contract conform to the public policy of the State when made, a change of public policy will not avoid it." One of the most pronounced illustrations of this principle is where A. sold to B. slaves prior to the adoption of the thirteenth amendment to the Federal Constitution, abolishing slavery. After the adoption thereof the note remained unpaid. A. brought suit thereon. The defense was public policy. It was held that the same was no ground of defense and A. was entitled to recover. *Ibid.* See also *Boyce* v. *Tabb,* 18 Wall. 546.

The Supreme Court in *Osborne* v. *Nicholson,* 13 Wall., at page 662, says: "Rights acquired by a deed, will or contract of marriage, or other contract executed according to statutes subsequently repealed subsist afterwards, as they were before, in all respects as if the statutes were still in force. This

is a principle of universal jurisprudence.  It is necessary to
the repose and welfare of all communities.  A different rule
would shake the social fabric to its foundations and let in a
flood tide of intolerable evils.  It would be contrary to 'the
general principles of law and reason' and to one of the most
vital ends of government.  The doctrines of the repeal of
statutes and the destruction of vested rights by implication,
are alike unframed in the law * * * The proposition, if car-
ried out in this case, would in effect take away one man's
property and give it to another, and the depreciation would
be 'without due process of law.' "

And in 9 *Cyc.* 576: "So a change in the law cannot make
an agreement illegal which was legal when it was made."
See also *Stephens* v. *Southern Pacific Co.,* 29 L. R. A. 751.

The decision in *B. & S. R. R. Co.* v. *Compton,* 2 Gill, 20,
sustains the right of the appellants to maintain an action at
law against the B. & O. Railroad Company as a consequence
of its action in abandoning the turnout and siding at Dor-
sey's run.  For after the B. & S. R. R. Co. had constructed
its railroad by authority of law through Compton's land, the
right of way through which land was condemned for the pur-
poses of the railroad, the railroad company, having been
authorized by an Act of Assembly to alter the location of its
road, abandoned that part of it which had been made through
the plaintiff's land; and Compton brought this action to re-
cover damages therefor.  The Court held that although the
change of location had been made by authority of the Legis-
latine, this did not exempt the company from liability to the
plaintiff for the loss sustained by him by reason of such
abandonment.

Where the grantor in consideration of $25 and of the build-
ing of the railway, conveyed to a company, its successors or
assigns forever in fee simple, the right of way through his
land, and added in the deed the following words: "It
is hereby agreed and understood a depot and station
is to be located and given to said O. Reeves, on the
land or strip above conveyed to be permanently located

for the benefit of said O. Reeves and his assigns, and to be used for the general purposes of the railroad company," the grantee by accepting such deed, entered into a covenant to comply with its terms, and this covenant ran with the land and became obligatory upon any second company which be came the purchaser under proper legal direction of all the rights, privileges, franchises and property of the former. *Ga. So. R. R.* v. *Reeves,* 64 Ga. 492.

"Where the owners of real estate sold a part thereof to a railroad company and in consideration of a sum of money to be paid, and of the covenants in the contract expressed, that the purchaser should restore certain switch connections, it was held in an action at law for the breach of the contract. that the covenant bound the railroad to continue the switch connections, and that the plaintiff was entitled to recover." *P. F. & W. & C. Ry. Co.* v. *Reno,* 123 Ill. 273. This case was first decided in 123 Ill. 39, in which the plaintiffs asked for a decree of specific performance to compel the railroad company to connect a switch with their main track. The Court refused to grant the relief prayed for in that case, but said that the plaintiffs were entitled to recover in an action at law. See also *Dorsey* v. *St. Louis, etc., R. R.,* 58 Ill. 67.

Reference is also made to the following cases in support of the same proposition: *Burnett* v. *Great N. Rly. Co.,* Law Rep. 10 Appeal Cases, 159; *Louisville, etc., Rly. Co.* v. *Sumner,* 106 Ind. 59; *Watson* v. *Alleghany R. R. Co.,* 74 Pa. 208; *Scholten* v. *St. Louis, etc., R. R.,* 101 Mo. App. Rep. 516; *Butler* v. *Tipton, etc., Co.,* 121 Ga. 817.

In *Texas and P. R. Co.* v. *Marshall,* 136 U. S. 393, the Court declared against the specific enforcement of a contract to make the City of Marshall the eastern terminus of the railroad, but the Court did emphatically authorize a suit for damages at law against the railroad for the breach of the contract.

Where a deed provided that the grantor, a railroad company, should establish and maintain a station on the land conveyed, the erection of a small building for temporary pur-

poses until the grantee could build a permanent structure, was not a compliance with the contract and the railroad never having erected a permanent structure it must respond in damages in an action at law. *Ecton* v. *Lexington Ry. Co.,* 59 S. W. Rep. 864.

Where a railroad covenants to maintain a good crossing, the company is responsible in damages for its breach. *Cincinnati S. Ry. Co.* v. *Hudson,* 88 Ky. 480.

Where certain parties constructed a lateral railroad over the land of another under an agreement with the owner, wherein it was stipulated that the road should be constructed in a particular manner, and with a turnout for the benefit of the owner of the land; the remedy for a violation of these clauses of the agreement is an action at law to recover damages thereby sustained. *Pusey* v. *Wright,* 31 Pa. 387.

For a full presentation of the question of the appellants' right to recover at law, see the note in 16 L. R. A. (N. S.) 307, *Taylor* v. *Florida East Coast Ry.*

The following cases are decisive on the point that a railroad is responsible in damages for the breach of its contract to maintain a siding: *St. Louis R. Co.* v. *Crandall,* 75 Ark. 89; *Indianapolis R. Co.* v. *Hood,* 66 Indiana, 580; *Taylor* v. *Cedar Rapids R. Co.,* 25 Iowa, 371; *New York R. Co.* v. *Stanley,* 34 N. J. Eq. 55; *Brooklyn Co.* v. *New York R. Co.,* 80 App. Div. 508; Affirmed in 178 N. Y. 593; *Waterson* v. *Alleghany R. Co.,* 74 Pa. 208; *Cumberland Valley R. Co.* v. *Baab,* 9 Watts, 458; *Conger* v. *N. Y. R. R.,* 120 N. Y. 29; *Willson* v. *Winchester & P. R. Co.,* 99 Fed. Rep. 642; *Gray* v. *Chicago, etc., R. Co.,* 189 Ill. 400.

*James A. C. Bond* and *Francis Neal Parke,* for the appellee.

The question on this record is whether the appellee committed a breach of its covenant when after nearly sixty years of faithful compliance with the terms of its covenant, it became unable to perform them because of a necessary change in the location of its roadbed.

The appellee maintains that the removal of the main stem of its railway from Dorsey's Run is not actionable in law because of either of the following two propositions:

(*a*) The duration of the covenant was so long as the railroad company should maintain its main stem on the route passing the point known as Dorsey's Run on the land conveyed by Judge Dorsey and wife to the appellee.

(*b*) The full and faithful discharge of this covenant for almost sixty years was a complete performance in the contemplation of law.

The charter of the Baltimore and Ohio Railroad Company, and its amendments, at the time of the execution of the deed to the company from Thomas B. Dorsey and wife, are the laws subsisting at the date of the deed and so form part of the deed in question, and determine the limitations of the obligations assumed. *St. Mary's Industrial School* v. *Brown,* 45 Md. 332.

The Court will take judicial notice of the charter of the Baltimore and Ohio Railroad Company, as it is a public statute creating a public corporation. *Baltimore* v. *B. & O. R. R. Co.,* 6 Gill, 296, 297; 21 Md. 91; *Chesapeake & Ohio Canal Co.* v. *West. Md. R. R. Co.,* 99 Md. 575; *Miller* v. *Matthews,* 87 Md. 464; *Bosley* v. *Susquehanna Canal Co.,* 3 B. 65; and see sec. 2 of Ch. 123, Acts of 1826.

This learned Court has construed the charter of the Baltimore and Ohio Railroad Company and determined that, at the time of the execution of the deed containing the covenant between the parties, the company had the undoubted power to change the location of its main stem. 108 Md. 22.

The law attributes to Thomas B. Dorsey and wife the knowledge that they were dealing with a public service corporation designed to accomplish great and important objects, under a charter which was to be construed with that liberty of interpretation which would best effectuate the designs of its creation and with no power to enter into any engagement which would in any manner interfere with the exercise of its corporate power in the discharge of its public obligations.

And furthermore .the law attributes to Thomas B. Dorsey and wife the knowledge that the Baltimore and Ohio Railroad Company had the power to change the location of its main stem, and could not contract with them to the contrary.

Hence, it is clear from the nature of the transaction and the limitations upon the contractual powers of the Baltimore and Ohio Railroad Company imposed by subsisting law, and the knowledge thereof imputed by law to the contracting parties, that a necessary term of the contract, implied by force of law, was that the covenant should only endure so long as the main stem of the appellee was maintained at Dorsey's Run.

The right of a railroad company to make the necessary improvements contemplated by its charter was intended in a large measure to be exercised for the public good, and it will not be presumed in the absence of clear words that the company intended to barter away that right, and thus disable itself wholly or in part to perform those public functions it has undertaken. *Lilley* v. *Pittsburg, V. & C. Ry. Co.,* 213 Pa. St. 247.

From the very nature of the contract it appears that the parties must from the beginning have known that it could not be fulfilled any longer than the main stem of the Baltimore and Ohio Railroad Company continued to remain on its location at Dorsey's Run, so that when entering into the contract the parties must have contemplated such continued location as the foundation of what was to be done; and hence, in the absence of any express stipulation that the main stem was to be continued forever on the same location, the contract must be subject to the implied condition that the appellee's performance of the contract is limited to the period in which the main stem of the appellee would remain on its location at Dorsey's Run. *Krell* v. *Henry* (1903), 2 King's Bench Div. (747).

This construction gratifies every requirement of the terms of the contract, and does not conflict with any rule of law or adjudicated cases.

But the position of the appellants obliges the Court to make a new contract. They would write the word "forever" into the covenant and change the words "to construct and maintain, etc." to the totally different words "to construct and maintain forever, etc." This cannot be done. To do so is to disregard the powers of the contracting parties, which are limited to those within the scope and spirit of the charter of the railroad company; to ignore the pregnant circumstances surrounding the covenant and embodied, in part, by the deed itself and to write into the covenant new terms upon which the minds of the contracting parties never met.

Not only does the construction of the appellants do violence to the language of the covenant, but it has been repudiated by the Courts. *Texas and Pacific Railroad Co. v. City of Marshall,* 136 U. S. 393.

The reasons for this construction are well set forth in this quotation from the similar case of *Texas and Pacific Railway Company* v. *Scott,* (41 U. S. App. 624), 37 L. R. A. 94, 98: "It cannot be true that an agreement on the part of a railway company to establish a station at a particular point is an agreement to keep it there forever. It must be that such an agreement is made subject to the general exigencies of business, the public interests, and to the change, modification and growth of transportation routes, as these may affect the requirements of the railway company's business. The contract having this limitation, we think that the establishment of a railway station and its maintenence to the full extent claimed or expected for thirty-six years is, under all the circumstances, a substantial and sufficient compliance with the terms of the contract relied on here. See also *Western Union Tel. Co. v. Penn.,* 125 Fed. Rep. 71; *Lucas v. Ry. Co.,* 130 Fed. Rep. 438; *Mead v. Ballard,* 7 Wall. 290; *Jessup v. Grand Central R. Co.,* 7 Ontario App. 128.

Apart from the fact that the change from Dorsey's Run of the location of the main stem of the appellee's railroad terminated the existence of the specific condition on which the performance of the covenant depended, we maintain the railroad

company has fully discharged the covenant by its fulfillment for almost sixty years. *M. & P. R. Co.* v. *Silver,* 110 Md. 517; *Texas & Pacific R. R. Co.* v. *City of Marshall,* 136 U. S. 393 (eight years); *Texas & Pac. Ry. Co.* v. *Scott,* 41 U. S. App. 624, 37 L. R. A. 94, 98 (thirty-six years); *Mead* v. *Ballard,* 7 Wall. 290; *Jessup* v. *Grand Central Ry. Co.,* 7 Ont. App. 132 (ten years), reversing 28 *Grant,* Ch. 583; *Jacksonville, Madison, etc., Ry. Co.* v. *Barbour et al.,* 89 Ind. 375 (thirty-three years); *Wilson* v. *Winchester & P. R. Co.,* 41 C. C. A. 215, 218, note.

SCHMUCKER, J., delivered the opinion of the Court.

This appeal brings before us for the second time the covenant which constitutes the cause of action in the present controversy. It came here first in a bill for its specific performance in the case of *Whalen* v. *Baltimore & Ohio Railroad Co.,* reported in 108 Md. 11. We having declined to grant the relief there asked for, the present suit at law was instituted in the Baltimore City Court to recover damages for an alleged breach of the covenant.

The railroad company as defendant below demurred to the declaration and the Court sustained its demurrer whereupon the plaintiffs appealed from the judgment for costs entered on the demurrer.

The declaration alleges that on May 5th, 1848, the railroad company by an indenture, of which profert is made, covenanted for the consideration therein mentioned with Thomas B. Dorsey and his wife their heirs and assigns "to construct and maintain a turnout and siding at Dorsey's Run on the main stem of said railroad, to take up and set down at said siding by the passenger cars of said company all persons going to and from the farm now occupied by the said parties of the first part and to leave at said siding to be unloaded any car in which any article or articles weighing at least three thousand pounds shall be laden for said parties and on which the cost of transportation shall have been paid at the place of lading."

It is further alleged in the declaration that the plaintiffs (appellants) have by mesne conveyances become seized of a large part of the land, owned and seized by the said Dorsey and wife at the time of the execution of the deed of 1848, and are entitled as the assigns of Dorsey and wife to enjoy the benefits of the covenants of that deed.

It is then averred that the railroad company from the year 1848 to the year 1907 has been abiding by and performing the covenants of said deed, in that it has been operating its passenger and freight trains over the right of way the deed described, and constructed and maintained a turnout and siding at Dorsey's Run on the line of its main stem, and took up and set down at the siding by its passenger cars all persons going to and from the said farm and delivered there all freight shipped thereto; but in the year 1907 the railroad company constructed a cut off on its main stem by virtue of which a large part of the right of way over the plaintiffs' land was abandoned, and it discontinued the turnout and siding at Dorsey's Run and refused, and still refuses, to take up and set down at that place by its passenger cars persons going to or from the farm, and that by reason thereof the plaintiff has sustained great damage in the several respects set forth in the declaration. There is no allegation that the railroad company fraudulently made the cut off and change of location in their main stem which resulted in the abandonment of the structures and stopping place at Dorsey's Run, nor was any such contention made at the hearing of the appeal.

In the suit for specific performance in 108 Md. we held, upon the authority of many cases then cited, that the covenant now in question constituted a valid contract binding upon the railroad company when entered into, and at that time capable of being specifically enforced, and that it ran with the land and enured to the benefit of the plaintiff as an assignee of a portion of the land. We declined to grant the specific performance and also the injunction asked for in that case, because, in our opinion, the railroad company had

the right and power to make the cut off which it did, and the consequent alteration of the line on its main stem, "for the purpose of straightening the lines and reducing its grades and thus improving its service to meet its obligations to the public and also to increase its earning capacity for the benefit of its stockholders." We further said in that connection that, "the very purposes of its creation forbid that it should be tied to the same location forever."

We concluded our opinion in that case by saying: "Whether the plaintiffs are entitled to compensation in damages for the abandonment by the defendant of the turnout and siding and train service, so long maintained by the appellee at that place, this Court is not now called upon to determine but we are all of the opinion that the relief prayed for in the bill of complaint must be denied, and that the appellants must be left to seek redress for any injury which they may have sustained by such abandonment in a Court of law."

Having decided in the equity suit that the covenant was valid and that it enured to the benefit of the present plaintiffs, we are now called upon to consider whether an abandonment of the turnout and siding at this late day, resulting from a lawful change by the railroad company of the line of its main stem, constituted a breach of covenant for which an action at law for damages will lie. The covenant being a written contract its construction is a matter for the Court.

In order to arrive at the real purpose and meaning of the parties to a contract the Court, according to the accepted canons of construction, considers the language employed, the subject-matter and the circumstances under which it was made.

Considering the language used in the covenant before us, it is to be observed, that while it distinctly provides for the construction and maintenance of the turnout and siding on Mr. Dorsey's land and the stopping of the cars at that point it is entirely silent as to the duration of the maintenance of those structures or that service. We cannot yield our assent to the contention of the appellant that the word "main

tain" ordinarily means to maintain indefinitely or forever. Its meaning in that respect depends upon the context in which it appears and the subject-matter to which it relates. There is plainly no specific or positive provision in the covenant touching the duration of the time during which the covenanted acts are to be done or privileges furnished.

In *Texas & Pac. R. R. Co.* v. *Marshall,* 136 U. S. 393, the Texas & Pacific Railroad Co. had covenanted, in consideration of the donation to it by the town of Marshall of $300,000 and sixty-six acres of land, to establish its eastern terminus at the City of Marshall and to construct there its main machine shops and car works. In one of the letters by means of which the contract was made the expression *"permanently* establish" the terminus, etc., occurred but in the others the word *permanently* did not appear. The money was paid and the land conveyed to the railroad company and it established its eastern terminus machine shops and car works at Marshall but after having maintained them there for eight years began to remove them to other places. The City of Marshall applied for an injunction to prevent their further removal. The U. S. Circuit Court, to which the application was made, granted the injunction but the case was reversed by the Supreme Court of the United States. In the opinion of the Supreme Court, speaking through JUSTICE MILLER, after alluding to the fact that the railroad company had established its terminus, machine shop and car works at the City of Mar shall and maintained them there for eight years, said:

"If, however, the city desired something more than this, if it desired to make sure that these establishments should forever remain within the limits of the City of Marshall and that the railroad company should be bound to keep them there forever, such an extraordinary obligation should have been acknowledged in words which admitted of no controversy. It would have been very easy to have inserted into this contract language which forbade the company from ever removing the terminus of the road to some other point or from ever remov-

ing or ceasing to use the depot, or the car and machine shops and thus have made the obligation perpetual."

In so far as public railway stations are concerned it was said by us in the recent case of *Md. & Penna. R. R. Co.* v. *Silver,* 110 Md. 517: "It has been held in a number of well-reasoned cases that the covenant on the part of a railroad company to erect and maintain a flag station for local trains at a certain place on its line, even if originally valid, is fairly complied with by the erection and maintenance of such a station for a period of years, and until the exigencies of its business, the convenience of the public and the welfare of the railroad demand its removal. *Texas* v. *Scott,* 37 L. R. A. 94; *Mobile* v. *People,* 132 Ills. 559; *Camp's Case,* 15 L. R. A. N. S. 594; *Jefferson* v. *Barbour,* 89 Ind. 375."

In the case in 108 Md. we recognized the soundness of the distinction, made in many decisions, between covenants to maintain stations for public convenience and those to establish and maintain sidings, turnouts, crossings and the like for private use merely. We there said that the former class of covenants are generally condemned as against public policy while the latter are to be governed by the circumstances of each particular case. The covenant now under consideration not only stipulates to construct a turnout and siding, on the main stem of the railroad, at Dorsey's farm but also "to take up and set down at said siding by the passenger cars of said company *all persons* going to and from the farm" and also to receive and deliver freight at that point under the conditions therein mentioned. The provision for stopping its passenger cars at the farm for *all persons* going to or from it comes very close to an agreement for establishing a public station of the kind involved in *Silver's Case,* in 110 Md.

In our opinion such a covenant as that, when it contains no stipulation for maintaining the structures or stopping the trains either in perpetuity or during a specified period, should, in view of the well known scope and purpose of a public service corporation like a railway company, be presumed to have been made subject to the exigencies of the

company's further development and needs.    As was said in the case of *Texas and Pacific Railway Company* v. *Scott,* 41 U. S. App. 624: "It cannot be true that an agreement on the part of a railway company to establish a station at a particular point is an agreement to keep it there forever.    It must be that such an agreement is made subject to the general exigencies of business, the public interests, and to the change, modification and growth of transportation routes, as these may affect the requirements of the railway company's business.    The contract having this limitation, we think that the establishment of a railway station and its maintenance to the full extent claimed or expected for thirty-six years is, under all the circumstances, a substantial and sufficient compliance with the terms of the contract relied on here."

When, in a case like the present one, after the company has maintained the structures and stopping place agreed on for more than fifty-nine years, it becomes necessary or desirable for the promotion of better public service to so alter the location of its road bed as to no longer pass the place mentioned in the covenant, and the change is made in good faith, we think the previous maintenance of the structures and stopping place should be regarded as a substantial performance of the covenant, and be held sufficient to discharge the company from further liability thereunder.

Eight years maintenance of a terminus, shops and car works was held in *Marshall's Case, supra,* to amount to a performance of the covenant.

Seventeen years maintenance of a public station until "the exigencies of business, the convenience of the public and the welfare of the railroad" demanded its removal, was held by us in the recent case of *Md. & Penna. R. R. Co.* v. *Silver, supra,* to constitute a fair compliance with a covenant to make and maintain a passenger and freight station on a specified lot of land conveyed to it for that purpose.

In the case of *Mead* v. *Ballard,* 74 U. S. 290, the ancestor of Mead conveyed in 1847 a tract of land in Wisconsin by a deed containing the following language, "said land being con-

veyed upon the express understanding and condition that the Lawrence Institute of Wisconsin chartered by the Legislature of said territory shall be permanently located on said lands;" and further provided that on the failure of such location being made within a year thereafter the land should, on the repayment of the purchase money, revert to the grantors. The institution was located upon the lands within the specified time and its buildings were erected thereon. About ten years thereafter the buildings burned down and were never rebuilt, but a larger and better set of buildings were erected on an adjoining lot of land. Mead the heir of the grantor thereupon tendered the purchase money and demanded a reconveyance of the land and upon the refusal of his demand brought suit. It was held in that case that when the trustees of the institute by resolution located it on the land and erected its buildings thereon the contract was complied with. It was further held that the use of the word *permanently* in the condition in the deed did not require them to rebuild the burned buildings and that the title to the land was not forfeited by the failure to do so. That case was in part decided upon the fact that by the terms of the deed the institute was to be located on the land within a year and that it therefore meant something that could be done in a year. but it is cited and relied on by the Supreme Court in the *Marshall Case.*

In view then of the absence from the covenant sued on in this case of any stipulation for the maintenance in perpetuity of the structures and service therein contracted for, and also in view of the very long time for which they were in fact maintained, and the nature of the event which caused their ultimate abandonment, we are of the opinion that there was no error in the action of the learned judge below in sustaining the demurrer and we will affirm the judgment appealed from.

*Judgment affirmed with costs.*